835 So.2d 82 (2002)
Catherine Watts SCOTT, Appellant,
v.
Leroy SCOTT, Appellee.
No. 2001-CA-00179-COA.
Court of Appeals of Mississippi.
June 11, 2002.
Rehearing Denied September 3, 2002.
Certiorari Denied January 16, 2003.
*83 Jessie L. Evans, Canton, attorney for appellant.
Reeves Jones, Jackson, attorney for appellee.
Before McMILLIN, C.J., BRIDGES, and IRVING, JJ.
IRVING, J., for the court.
¶ 1. Catherine Watts Scott appeals from an amended final judgment of divorce rendered by the Chancery Court of Madison County, Mississippi, which changed the division of marital property between her and Leroy Scott, her ex-husband. She does not challenge the granting of the divorce. However, she raises two property-related issues: (1) whether the lower court abused its discretion and committed manifest error in dispossessing her of the marital domicile and (2) whether the lower court made an equitable distribution of the marital assets.

FACTS
¶ 2. On October 26, 2000, the twenty-five-year marriage of Catherine and Leroy Scott came to an end when a final judgment of divorce was entered by Chancellor William J. Lutz. Leroy was not present for the divorce hearing which was held two days prior to the judgment being entered.
¶ 3. The final judgment awarded a divorce to Catherine on the ground of habitual cruel and inhuman treatment. Also, she was awarded exclusive ownership and possession of the marital residence, two acres of land inherited by Catherine from a relative on which the marital residence was located, furniture and furnishings *84 within the home, title and exclusive possession of a 1979 Cadillac, reimbursement in the amount of $1,500 for clothing destroyed by Leroy, and $150 reimbursement for appraisal of the marital home. Leroy was awarded exclusive possession and ownership of his American Express Mutual Fund and exclusive possession and ownership of 10.1 acres of land in Madison County.
¶ 4. Thereafter, Leroy filed a motion to set aside judgment and set trial date. Affidavits were filed by Leroy's original attorney explaining that the attorney did not receive an order of continuance and was unaware of the October 2000 hearing. On December 4, 2000, Leroy's new attorney and Catherine's attorney reached an agreement which provided that the court would set aside only those parts of the final judgment for divorce pertaining to the property of the parties and that those issues would be tried at a later date.
¶ 5. The hearing to address the property division occurred on January 16, 2001. Prior to the hearing, both parties submitted financial statements as required by Rule 8.05 of the Uniform Chancery Court Rules. Catherine's statement showed her sole monthly income as $378 for Social Security. Her total monthly living expenses were listed at $474.88; her assets were listed as real estate (the marital domicile) at $40,000, and furniture and appliances at $10,000, for a total of $50,000. Leroy's statement showed his net monthly income as $574 and his monthly living expenses as $570. Listed assets were real estate (the marital home) at $20,000, 10.1 acres of land in Madison County at $5,050, 1979 Cadillac at $1,000, 1978 Buick at $900, 1970 Dodge at $800, shotgun at $50, pistol at $30, lawn mower at $100, T.V. at $130, furniture at $500, and American Express Mutual Fund at $11,000, for a total of $39,560. At the time of the hearing, both parties' income had increased since the disclosure of their financial statements. Catherine was receiving $449 a month in disability, and Leroy was receiving $1,100 a month from employment. Also, it was determined that Leroy's American Express Mutual Fund had appreciated in value to $12,000. An appraisal of the marital home placed the value of the home at $22,000. The chancellor did not do an evaluation of the marital estate or indicate which of the parties' evaluations he considered credible.
¶ 6. After the hearing, the chancellor entered an amended final judgment of divorce. In the amended final judgment, Leroy was awarded exclusive ownership and possession of the parties' marital residence, one half of his American Express Mutual Fund, exclusive ownership of all personal property outside the home including the lawnmower and all of the automobiles. He was also given the following additional items: his guns, tools, clothes, an armoire where his clothes were located, one bed, the kitchen table and chairs, a reasonable amount of linen, towels, cookware and the second best set of plates and glasses. Catherine was awarded the sum of $9,840 for her share of the equity in the marital residence plus $1,000 for the value of the two-acre lot which Catherine brought into the marriage.[1] Catherine was also awarded one half ($6,000) of Leroy's American Express Mutual Fund and all personal property inside the marital residence except that which was given to Leroy. Finally, the chancellor ordered that all findings of fact, conclusions of law, and orders of the court contained in the original final judgment of divorce entered on October 26, 2000, and consistent with *85 the amended final judgment, would remain in full force and effect.

ANALYSIS AND DISCUSSION OF ISSUES

Equitable Division of the Marital Estate
¶ 7. Although Catherine asserts two issues, both of them concern the manner in which the chancellor divided the property; therefore, this Court will collapse these issues and address them as equitable division of the marital estate. This Court will not reverse a chancellor's findings unless they are manifestly wrong, clearly erroneous or an erroneous standard is applied. Reddell v. Reddell, 696 So.2d 287, 288 (Miss.1997). When reviewing a chancellor's findings, this Court employs a limited standard of review. Id. This Court looks to the chancellor's application of the Ferguson factors when reviewing questions of equitable distribution. Ferguson v. Ferguson, 639 So.2d 921, 928 (Miss.1994).
¶ 8. The Ferguson factors are: (1) substantial contribution to the accumulation of the property. Under this factor, the chancellor should consider (a) the parties' direct or indirect economic contribution to the acquisition of the property, (b) the parties' contribution to the stability and harmony of the marital and family relationships as measured by quality, quantity of time spent on family duties, and duration of the marriage, and (c) the contribution to the education, training or other accomplishments by the other spouse bearing on the earning power of the spouse accumulating the assets; (2) the degree to which each spouse has expended, withdrawn or otherwise disposed of marital assets and any prior distribution of such assets by agreement, decree or otherwise; (3) the market value and the emotional value of the assets subject to distribution; (4) absent equitable factors to the contrary, the value of assets not ordinarily subject to such distribution, such as property brought to the marriage by the parties and property acquired by inheritance or inter vivos gift by or to an individual spouse; (5) tax and other economic consequences, and contractual or legal consequences to third parties, of the proposed distribution; (6) the extent to which property division may, with equity to both parties, be utilized to eliminate periodic payments and other potential sources of future friction between the parties; (7) the needs of the parties for financial security with due regard to the combination of assets, income and earning capacity, and (8) any other factor which in equity should be considered. Ferguson, 639 So.2d at 928.
¶ 9. The chancellor assessed the Ferguson factors in the following manner: (1) Substantial Contribution to the Accumulation of the Property. The chancellor determined that Leroy's paycheck had always been the primary paycheck, that Catherine had brought into the marriage two acres which she had inherited and that she would be given the value of them. Also, he determined that the 10.1 acres was Leroy's separate estate and that both parties had made a substantial contribution to the house and $12,000 in savings. (2) Direct or Indirect Economic Contributions to the Acquisition. The chancellor determined that both parties contributed. He determined that the parties' contribution was equal because "[w]hatever money they had coming in either went to feed and clothe the family and pay for the mortgage, or it went into savings." Therefore, there should be an equal distribution. (3) Stability and Harmony of Marital Relation. The chancellor determined that there was nothing to consider. (4) Contributions by the Other Spouse Affecting the *86 Earning Power of the Spouse Accumulating the Assets. The chancellor noted that no evidence was introduced pertaining to this factor. (5) Degree Each Spouse Has Expended, Withdrawn or Disposed of Marital Assets and Any Prior Distribution of Such Assets. The chancellor took note of the period when Mrs. Scott moved a family in the home and collected rent. He assumed she spent the rent on herself. However, whatever was received, the chancellor did not consider it to be substantial. (6) Market Value and Emotional Value of Assets. The chancellor stated that the house was moved onto the property, that he was aware of what it cost then, that the value of the land was known and that there was "some evidence that Leroy put in some time and some money, as time went by, to improve the house and land." The chancellor did not comment on the emotional value of the home to Catherine even though the land on which it sits was inherited from Catherine's family and is located in the area where some members of Catherine's family reside. (7) The Extent to Which Property Division, with Equity to Both Parties Be Utilized to Eliminate Periodic Payment. The chancellor simply stated, "We will do that." (8) The Need of the Parties for Financial Security. The chancellor noted that neither party was well-off but that Leroy still had the ability to work and Catherine was on a fixed income. (9) Any Other Factor. The chancellor noted that Mrs. Scott had been living with her sister for over a year.
¶ 10. We first observe that the largest and most valuable pieces of property consisted of three items: the marital home, the $12,000 saving account, and the 10.1 acres of land. As stated, the land upon which the marital home rests was inherited by Catherine prior to the parties' marriage. Also, prior to the marriage, Catherine purchased the house (which became the marital domicile) and had it moved onto the two-acre tract. We further note that the chancellor did not evaluate the marital estate or indicate which of the parties' valuation he considered most reliable. In this regard, we observe a huge difference between Catherine's and Leroy's assessed value for the contents of the home. Leroy placed a value of $500 on the furniture, and Catherine placed a value of $10,000 on the furniture and appliances. Additionally, Leroy assessed a value to other personal property while Catherine did not.
¶ 11. Catherine argues that she should have been awarded the marital home because the land on which the home sits was inherited by her and she paid the mortgage, without the assistance of Leroy, which she incurred as a result of purchasing the house which was placed on the lot. Furthermore, Catherine avers that her need for financial security is a Ferguson factor which was disregarded by the chancellor. Also, she argues that the chancellor focused on the fact that she was disabled in recent years and totally disregarded the fact that she made nearly all monetary contributions toward the mortgage and upkeep on the home prior to her becoming disabled. Catherine asserts that under Ferguson, the lower court should have considered that Leroy already had property and a mobile home on his property.
¶ 12. Catherine points out that she wanted only the marital home, not even a share of Leroy's American Express savings or anything else. She argues that the chancellor failed to equitably divide the marital estate. She notes that in arriving at her half of the value, the chancellor subtracted a theoretical commission of six percent ($1,320) from the market value of the home ($22,000), leaving a net equity of $20,680. She asserts that this calculation was incorrect because the house was not *87 sold. Thus, a commission should not have been subtracted. Secondly, Catherine claims that she is still due reimbursement in the amounts of $150 for an appraisal of the home and $1,500 for clothing destroyed by Leroy.
¶ 13. We determine that this case must be reversed and remanded for a number of reasons. As previously observed, the chancellor failed to evaluate the marital estate. It is impossible for this Court to perform its oversight responsibility in the absence of such a valuation, particularly since there is a $9,500 variance between the parties' valuation of some of the personal property, viz, the furniture and appliances. Additionally, Catherine's financial disclosure statement did not list the vehicles while Leroy's listed a Cadillac, Buick, and Dodge at an aggregate value of $2,700. Again, the chancellor did not make any determination as to the value of these vehicles even though he gave all of them to Leroy. We also agree with Catherine that the chancellor should not have deducted a sales commission from the appraised value of the home since it was not being sold. Further, the value placed on the two acres of land was based on 1970s value. The record does not reflect any information regarding their current value. The appraisal of the home does not give separate values for the land and the improvements.
¶ 14. Since we are reversing and remanding this case for further consideration by the chancellor, we make some additional observations. First, as previously mentioned, the chancellor determined that the parties' contribution to the acquisition of the marital property was equal. In reaching this conclusion, he discussed primarily the home. Yet, our review of the record does not support the chancellor's finding that the parties' contribution to the acquisition to the marital property was equal and that Leroy's paycheck had always been the primary one. Although Catherine testified that she had been disabled since 1986, she gave uncontradicted testimony that she had worked full-time until her disability in 1986. Catherine testified that she paid the mortgage on the marital home. More importantly, the mortgage was paid in full in 1983, three years prior to the onset of Catherine's disability, when her adult child gave her the money to pay the home off.[2]
¶ 15. Second, the chancellor determined that Leroy had equity in the house because Leroy had put time and money in it. Although Leroy presented a few receipts, none of the receipts were dated later than 1980. We recognize that Catherine did not produce any receipts, but it was uncontradicted that she inherited the land, financed the home alone, and the title remained in her name until 1987.[3] Moreover, Catherine's testimony that her son gave her $1,000 to pay off the remaining balance of the mortgage was uncontradicted Although Leroy testified that he helped to pay the mortgage, he was unable to remember how much the mortgage payments had been. He testified that he did not keep up with amounts paid because he sometimes paid half and always gave Catherine cash.
¶ 16. Third, under the "financial security" factor, the chancellor correctly noted that neither party was well-off but Leroy still had the ability to work. The chancellor explained that he believed Catherine would eventually lose the home due to her low income, and this appeared to be one of his primary reasons for awarding the *88 house to Leroy. However, the mortgage on the home was fully paid. Additionally, according to the uncontradicted testimony of Catherine, her children routinely send her money and purchase clothes for her.
¶ 17. The chancellor took a home with a fully paid mortgage from Catherine, whom the chancellor noted was unable to work, and gave it to Leroy who had almost three times her income. Lastly, in considering the "any other factor," the chancellor examined the fact that Catherine had been living with her invalid sister for over a year. The chancellor explained that Catherine could continue to live with her sister but that Leroy did not have anywhere to go. Yet, the chancellor failed to consider that Leroy owns 10.1 acres of land and a mobile home, both of which could be utilized by Leroy.
¶ 18. Finally, we note that whether Catherine could maintain upkeep on the home does not appear to us a valid consideration for failing to award the home to her if equity otherwise dictated such result. Yet that appears to be the chancellor's overarching consideration in not awarding the home to Catherine. Also, it appears from the record that the chancellor viewed the fact that Catherine had spent some time caring for an invalid sister as irrefutable evidence that Catherine had some other place to live, a fact that is not borne out by the record. More importantly, the judge questioned whether Catherine could get the money to pay Leroy for his share of the marital home, as well as how soon she could move in if the home was awarded to her. Catherine stated that she could get the money from her children and be ready to move in as soon as the judge allowed. The judge had a problem with this explanation because if Catherine left her disabled, invalid sister with whom she has lived for the past year then the sister would be left alone. We fail to see how the sister's well-being should have any impact on the equitable distribution of the marital estate. Moreover, according to Catherine, she did not leave the marital domicile to take care of an invalid sister. Rather, she asserts that she left the marital home out of fear for her life.
¶ 19. For the reasons above, we reverse and remand this case to the Chancery Court of Madison County for a complete evaluation of the marital estate and a reconsideration of the distribution of the estate, consistent with this opinion, following that evaluation. The grant of the divorce is not disturbed by this opinion as neither party raised it as an issue here.
¶ 20. THE JUDGMENT OF THE MADISON COUNTY CHANCERY COURT IS REVERSED AND REMANDED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
McMILLIN, C.J., KING, P.J., BRIDGES, THOMAS, LEE, MYERS, CHANDLER AND BRANTLEY, JJ., CONCUR. SOUTHWICK, P.J., CONCURS IN RESULT ONLY.
NOTES
[1] The marital home is located on this two-acre lot.
[2] The child who gave her the money was a child she had before she met Leroy.
[3] We recognize that Leroy did contradict her on the fact that he paid the mortgage also.